Filed 3/12/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PEDRO LOPEZ,<br><br>    Defendant and Appellant. | F076295<br><br>(Super. Ct. No. VCF325028TT)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian,[*] Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Julie A. Hokans, and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Retired judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Pedro Lopez (defendant) was one of several Norteño gang members found guilty of conspiring to commit two home invasion robberies. Law enforcement agencies were already conducting a wiretapping operation when the conspiracy began to develop. As a result, the perpetrators were apprehended while driving to the targeted homes and were thwarted from committing the intended crimes. Defendant appeals from a judgment of conviction on counts of unlawful possession of a firearm and ammunition, attempted robbery, conspiracy to commit robbery, and a violation of the gang conspiracy statute, Penal Code section 182.5 (all further statutory references are to this code).

Defendant's claims allege insufficient evidence, instructional error, and sentencing error. He presents meritorious arguments with regard to a duplicative conspiracy charge and the section 182.5 conviction, although the latter count need only be modified to conform to the jury's findings. On the topic of sentencing, we hold a conspiracy conviction under section 182 may be subject to the alternate penalty provision of section 186.22, subdivision (b)(4)(B), which imposes a prison term of 15 years to life for certain gang-related crimes. We affirm in part, reverse in part, and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

The People's evidence showed, and defendant does not dispute, that the Norteños are a criminal street gang with members located throughout the Central Valley of California. Defendant was affiliated with a Norteño "subset" in Fresno County called Varrio East Side Reedley. Gang members from other subsets or "cliques" also participated in the underlying events, and there are no issues regarding the perpetrators' common ties to an overarching criminal enterprise.

In 2015, multiple law enforcement agencies conducted a joint investigation into the activities of Norteño gang members in Tulare County. Operation Red Sol involved the wiretapping of phones used by certain high-ranking members, including Emanuel Avalos, Rigoberto Benavidez, and Pedro Sanchez. Sanchez held the position of

2.

"regiment commander" and was considered "the boss of Tulare County." Avalos lived in Lindsay and held the subordinate position of "south county leader." Investigators believed Benavidez was in the process of "taking over Madera County," which suggested he and Sanchez were similarly situated within the gang's organizational hierarchy.

On August 24, 2015, law enforcement agents listened as Sanchez, Benavidez, and Avalos began recruiting people for a "job" in Visalia. Sanchez communicated with defendant both telephonically and via text messaging, and defendant agreed to meet up with the "workers" that evening. In a separate message exchanged between Sanchez and Benavidez, Sanchez remarked, "This is a good lick and great opportunity." The agents understood the word "lick" to be a slang term for robbery.

In addition to monitoring the electronic communications, agents conducted visual surveillance outside of Avalos's home in Lindsay and Benavidez's apartment in Visalia. At approximately 4:00 p.m., Sanchez and Avalos met at Avalos's residence with a gang member named Luis Corona and several unidentified Hispanic males. Corona subsequently departed in a white Nissan Altima.

Over the next few hours, the involved parties alluded to a plan for the robbers to impersonate agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF). Conversations between Sanchez and Avalos specified that uniforms would be provided and everyone would be armed with guns. Benavidez worked on finding a suitable place for the men to convene before and after the robberies. Earlier in the day, he had asked the central county leader, Val Ornelas, for assistance in locating a safe house near Pinkham Street, "anywhere from Lovers Lane to Ben Maddox [Way] and from Noble [Avenue] to Tulare [Avenue]."

Shortly after 7:00 p.m., Benavidez drove to the 1100 block of Pinkham Street and met up with four people in a white Nissan Altima, which had just driven there from Avalos's residence. Avalos's brother, Cervando, was among the group of people in the white car. Both vehicles then drove to Benavidez's apartment complex on South Encina

3.

Street, and Benavidez called Sanchez to tell him the designated meeting place could not be used and everyone should meet at his apartment. Sanchez sent defendant a message informing him of the change, and defendant proceeded to contact Benavidez for directions. At approximately 7:35 p.m., defendant and a group of unidentified passengers arrived at Benavidez's apartment in a silver BMW.

At 7:47 p.m., Cervando Avalos began making a series of calls to his brother and Sanchez to complain about defendant's crew being unprepared. There were no ATF uniforms and some people did not have ammunition for their firearms. They were also in need of a second vehicle. Cervando said defendant's BMW had "dealer plates" and other distinctive features that made it "too easy to spot." When apprised of the situation, Sanchez authorized a 24-hour postponement. While Cervando was talking to Sanchez, defendant's group left to obtain bullets and returned a few minutes later.

During a subsequent phone call between the Avalos brothers, Emanuel asked to speak with whoever was "in charge there." Defendant came on the line and provided a status report, claiming they were "stocked up" with weapons and had two bulletproof vests. Emanuel asked, "Is there anything on there that says ATF?" Defendant said no and described the attire as "SWAT gear."

Agents conducting aerial surveillance observed defendant's BMW leave the apartment complex again and drive to the vicinity of Pinkham Street and Noble Avenue. The car drove slowly through a neighborhood before returning to Benavidez's apartment at approximately 8:29 p.m. About 30 minutes later, Benavidez sent the following text message to Sanchez: "'The homie went by the layout. I think we can handle it. The little homie just needs a few more [people].'" Sanchez replied that he had a crew "'ready to go'" and would "'be on it tomorrow.'"

On August 25, 2015, defendant sent a text message to Sanchez: "'On track, brother, so you know[,] [I am] here in your area doing a bit more homework on the two job sites.'" Sanchez replied, "'Okay. [We'll] give it another try tonight. I'll be with you

4.

shortly with some ideas.'"  Later that afternoon, Sanchez exchanged the following text messages with a person named Ricardo Reyes:

> Sanchez: "'Need two to three people for two pads [houses].  They'll be part of a team tonight in [Visalia].  We've been doing homework for two days and tonight's a go.  Are you [in]?'"
>
> Reyes: "'[Yes.]  I got the squad already, too.  What is it, though, and is it worth it?'"
>
> Sanchez: "'It's two pads … square people.  They got safes and guns and gold.  Just bring bangers [guns].'"
>
> Reyes: "'Got 'em.  What part of Visa[lia]?'"
>
> Sanchez: "'By Walmart off Ben Maddox.'"
>
> Reyes: "'How much people in each pad?'"
>
> Sanchez: "'[They're neighboring houses.]  [One] has two people.  One has one.  Old lady and a husband and wife ….  It's easy.  Got to be quick.'"
>
> Reyes: "'Oh, we'll be fast.  Who is gonna show us where it's at and [it's] a for sure one right?'"
>
> Sanchez: "'Yes, we have a safe spot close by where we will meet up.'"

Due to problems acquiring one or more stolen vehicles, which apparently were preferred over cars that could be traced back to them, the participants decided to use the white Nissan Altima and Emanuel Avalos's white Ford Explorer.  Emanuel planned to wait in his vehicle during the robberies and then use it to transport the loot.  He and gang member Juan Hinojosa discussed tying up the victims to prevent them from seeing the cars.  When Avalos expressed concern about waiting outside without a gun, Hinojosa reminded him, "It's an old guy and an old lady."

At approximately 7:12 p.m., Sanchez sent a text message to Reyes confirming that the "'thing'" in Visalia was "'[i]n process.'"  At 7:24 p.m., defendant texted Sanchez to

5.

say he was "'[h]eading that way.'" At approximately 7:53 p.m., after his BMW had pulled up to Benavidez's apartment complex, defendant sent another message: "'We here.'" During the same general time frame, Avalos informed Sanchez that his group was almost in Visalia and were "'ready to move once at the house.'"

At 8:03 p.m., the BMW moved to an adjacent street. The Nissan Altima and Ford Explorer arrived a few minutes later. At approximately 8:20 p.m., the BMW's occupants got into the other vehicles, which then began driving toward Noble Avenue.

At 8:28 p.m., Emanuel Avalos sent a message to Sanchez: "'We in motion. I'll update you soon.'" About a minute later, police attempted to stop the Altima. The lights and siren of a marked patrol car were activated as the Altima was driving east on Noble Avenue, past the Ben Maddox Way intersection and heading toward the Walmart referenced in Sanchez's text messages. The Altima accelerated and a high-speed chase ensued, which continued until the car sustained damage driving over a median. The five occupants fled on foot but were apprehended; police arrested Luis Corona, Sergio Heredia, Juan Hinojosa, Roberto Saldana, Jr., and defendant.

A search of the Altima yielded a 22-caliber AR-style rifle and a pair of black latex gloves. A mask and second pair of gloves were found outside the vehicle, and four additional firearms were seized in conjunction with the suspects' arrests. Most of the firearms had been discarded and/or hidden in areas near where the suspects were detained. The guns were loaded, and one had been wrapped up inside of a ski mask.

Defendant's case was severed from a larger prosecution of dozens of people. He was charged with conspiracy to commit "home invasion robbery" (§§ 182, subd. (a)(1), 211, 213, subd. (a)(1)(A); counts 19 & 162); participation in a "criminal street gang conspiracy" to commit the same target offense (§ 182.5; count 20); possession of a firearm by a convicted felon (§ 29800, subd. (a)(1); count 156); unlawful possession of ammunition (§ 30305, subd. (a)(1); count 160); and "attempted home invasion robbery" (§§ 664, 211, 213, subd. (a)(1)(A); count 163). (Original capitalization omitted.) Each

6.

offense was alleged to be gang related within the meaning of section 186.22, subdivision (b)(1).

Counts 19, 20, and 162 were alleged to be punishable by an indeterminate life term under section 186.22, subdivision (b)(4). Defendant was further alleged to have suffered a prior strike and serious felony conviction (§§ 667, subds. (a)(1), (b)–(i), 1170.12) and to have served two prior prison terms within the meaning of former section 667.5, subdivision (b). A firearm enhancement was pleaded pursuant to section 12022.53, but it was effectively dismissed after the People refrained from presenting the allegation to the jury.

The People's case established the facts summarized above. The defense rested without presenting any evidence. Defendant was convicted as charged (except for the firearm enhancement) and sentenced to 35 years to life in prison plus a consecutive determinate term of 19 years. Sentencing details are provided in the final section of the opinion.

## DISCUSSION

### I. Attempted First Degree Robbery

Defendant claims the People failed to prove the elements of attempted robbery as alleged in count 163. "On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt." (*People v. Boyer* (2006) 38 Cal.4th 412, 479.) We construe the record in the light most favorable to the judgment and presume "'the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Mendez* (2019) 7 Cal.5th 680, 702.)

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Section 212.5 divides the offense into degrees, and "every

7.

robbery which is perpetrated in an inhabited dwelling house" constitutes "robbery of the first degree." (*Id*., subd. (a).) Harsher punishment is imposed for robberies committed "in concert with two or more other persons … within an inhabited dwelling house." (§ 213, subd. (a)(1)(A).) The aggravated form of first degree robbery is commonly referred to as "robbery in concert" or "home invasion robbery." (*People v. Jones* (2012) 54 Cal.4th 350, 367; *People v. Epperson* (2017) 7 Cal.App.5th 385, 391.)

A criminal attempt consists of two elements: the specific intent to commit a crime and "a direct but ineffectual act done toward its commission." (§ 21a.) Case law describes the second element as an "overt act" requirement. "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.'" (*People v. Watkins* (2012) 55 Cal.4th 999, 1021, quoting *People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).) Therefore, attempted robbery requires the specific intent to commit robbery and an overt act toward its commission that goes beyond planning or preparation.

"[P]reparation consists of devising or arranging the means or measures necessary for the commission of the offense, while the attempt is the direct movement toward its commission after the preparations are made." (*People v. Memro* (1985) 38 Cal.3d 658, 698, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) "[W]hen the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway …." (*People v. Dillon* (1983) 34 Cal.3d 441, 455 (plur. opn.) (*Dillon*).) For example, in *People v. Bonner* (2000) 80 Cal.App.4th 759, the appellant was convicted of attempted robbery despite never encountering his intended victims. Michael Bonner had inside information about a hotel manager's routine of transporting cash to a bank. With a plan to rob the manager and his assistant as they were leaving the building, Bonner went to the hotel and hid in a garage-level laundry room while armed and wearing a mask. The housekeeping staff walked in on him, and he fled the scene. (*Id*. at pp. 761–762.) The appellate court

8.

noted that an overt act need not be "the last proximate or ultimate step toward commission of the crime." (*Id.* at p. 764, citing *People v. Kipp* (1998) 18 Cal.4th 349, 376.)

The dividing line between acts of preparation and a criminal attempt "depends upon the facts and circumstances of a particular case." (*Decker*, *supra*, 41 Cal.4th at p. 14.) "Although a definitive test has proved elusive, [courts] have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.'" (*Id.* at p. 8, quoting *People v. Anderson* (1934) 1 Cal.2d 687, 690 (*Anderson*).) The stronger the evidence of intent, "the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement." (*Dillon*, *supra*, 34 Cal.3d at p. 455.) In other words, "[w]here the intent to commit the crime is clearly shown, an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown." (*People v. Bonner*, *supra*, 80 Cal.App.4th at p. 764.)

Defendant's opening brief factually distinguishes this case from *Dillon*, *Anderson*, and *People v. Vizcarra* (1980) 110 Cal.App.3d 858, each of which involved would-be robbers who, in defendant's words, reached "the immediate vicinity of the location" of the intended crime. In *Anderson*, where the California Supreme Court first adopted the slight acts rule, the brandishing of a firearm roughly two feet away from a theater's ticket window was held to constitute attempted robbery. However, the high court described the appellant's "conduct in concealing the gun on his person and going to the general vicinity" of the theater as "mere acts of preparation." (*Anderson*, *supra*, 1 Cal.2d at p. 690.) In *Vizcarra*, the appellant's movement toward a liquor store while armed with a rifle was deemed "a sufficient direct act toward the accomplishment of the robbery" in light of his effort to "hide on the pathway immediately adjacent to the liquor store when observed by a customer." (*Vizcarra*, *supra*, 110 Cal.App.3d at p. 862.) In *Dillon*, the

9.

appellant committed attempted robbery by breaching the outer perimeter of a marijuana farm—which he knew to be guarded—while he and his accomplices were in possession of "guns, knives, clubs, masks, rope, and strips of sheeting." (*Dillon, supra*, 34 Cal.3d at pp. 455–456; see *id.* at p. 451.)

Defendant claims he did not get close enough to the targeted houses to commit attempted home invasion robbery. In response, the People rely on the slight acts rule and characterize the "general vicinity" statement in *Anderson* as obiter dictum. (*Anderson, supra*, 1 Cal.2d at p. 690; see *Childers v. Childers* (1946) 74 Cal.App.2d 56, 61 ["There is no kinship between *stare decisis* and *obiter dictum*. Whatever may be said in an opinion that is not necessary to a determination of the question involved is to be regarded as mere dictum."].) In his reply brief, defendant argues the *Anderson* dictum was cited approvingly in *People v. Garton* (2018) 4 Cal.5th 485 (*Garton*), which is true. Defendant directs our attention to page 512 of *Garton*, but the more salient reference is made in a string citation to support the following statement: "[O]ur case law does not suggest that a defendant with clearly shown intent need only make preparations or start moving toward the intended victim to be guilty of attempted murder." (*Id.* at p. 514.)

The appellant in *Garton* was a Shasta County resident who had devised an elaborate plot to kill a man who lived in Gresham, Oregon, and who worked in the nearby city of Portland. (*Garton, supra*, 4 Cal.5th at pp. 490–491, 508–509.) Todd Garton spent months planning the murder and even travelled to Oregon to familiarize himself with the man's home and place of business. (*Id.* at pp. 491, 508.) Garton was having sexual relations with the intended victim's wife, and she was in on the plan. (*Id.* at pp. 490–491.)

In February 1998, Garton and two accomplices "loaded Garton's car with an assortment of guns, ammunition, and knives, as well as a homemade silencer, latex gloves, and two walkie-talkies," and then drove from Shasta County to Gresham, Oregon. (*Garton, supra*, 4 Cal.5th at p. 509; see *id.* at p. 496.) They arrived the same day and

spent the night at a motel. The next morning, the trio drove to the intended victim's workplace and waited in a parking garage, intending to kill him when he arrived. However, "unbeknownst to Garton, [the wife had told her husband] to drive the larger of their cars, knowing that this car would not fit into the garage where the three men waited. After realizing that [he] had parked elsewhere, the men left.…" (*Id.* at p. 491; see *id.* at p. 509.)

The relevant issue in *Garton* was whether the trial court had territorial jurisdiction over a charge of conspiracy to commit an out-of-state murder. Under the law in effect in 1998, such jurisdiction would not have existed unless the "acts within California's borders independently constituted an attempt to commit murder." (*Garton*, *supra*, 4 Cal.5th at p. 510.) In a four-to-three decision, the California Supreme Court concluded the steps taken by Garton in his home state were insufficient to satisfy the overt act element of attempted murder. (*Id.* at p. 513.) Two circumstances were dispositive: First, "Garton's actions in California did not occur in close proximity to the victim or to the anticipated site of the murder in the Portland area." (*Id.* at p. 512.) Second, "Garton's actions in California on February 6, 1998, were temporally separated by one night from his actions in Oregon on the morning of February 7, 1998." (*Id.* at p. 513.) Therefore, "at the moment defendant and his coconspirators entered into Oregon, the plot to kill [the intended victim] was not 'in such progress that it [would] be consummated unless interrupted by circumstances independent of the will of the attempter ….'" (*Id.* at pp. 513–514.)

The facts of this case differ significantly from those in *Garton*. When Garton reached the Oregon border, he was still hundreds of miles away from his intended victim. (*Garton*, *supra*, 4 Cal.5th at p. 525 (conc. & dis. opn. of Chin, J.).) Here, defendant was in a car travelling east on Noble Avenue and approaching the intersection of Pinkham Street, i.e., the neighborhood in which the jury impliedly found the targeted homes were located. In terms of temporal proximity, the Altima was on course to reach its destination

11.

in a matter of minutes or even seconds.[1]  However, in further contrast to *Garton*, defendant's plan was thwarted by police intervention.

If the unlawful design involves "concerted action—and hence a greater likelihood that the criminal objective will be accomplished [citation]—there is a *greater* urgency for intervention by the state at an *earlier* stage in the course of that conduct." (*Decker*, *supra*, 41 Cal.4th at pp. 10–11.)  "When a defendant's intent is '"clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime."'" (*People v. Davis* (2009) 46 Cal.4th 539, 606, quoting *People v. Memro*, *supra*, 38 Cal.3d at p. 698.)  In this instance, police saw a nefarious plot being carried out in real time and intervened after the participants had clearly demonstrated their intent to commit a home invasion robbery.  The question is whether the law required defendant to reach the targeted home or take even further steps toward committing the crime in order for jurors to find the requisite overt act.

"The standard is not that attempt liability attaches when law enforcement may lawfully intercede for investigative or crime prevention purposes." (*Garton*, *supra*, 4 Cal.5th at p. 510.)  "If it is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway …." (*Dillon*, *supra*, 34 Cal.3d at p.

---

[1]The jury viewed People's exhibit No. 14, which is a video containing 11 minutes of aerial surveillance footage beginning shortly before the Altima departed from Benavidez's apartment complex and ending after its occupants had exited the car and began running from the police.  The recording equipment had mapping software, so the roadways traversed by the vehicle are identified in the video.  The time counter reads 20:29:43 (8:29 p.m. and 43 seconds) at the approximate moment when a police car pulls behind the Altima as it is crossing over South Ben Maddox Way.  The Altima reaches the intersection of East Noble Avenue and South Pinkham Street approximately 35 seconds later, when the counter reads 20:30:18.

455.)  After careful consideration of the governing principles, we conclude the evidence is sufficient to support the verdict of attempted first degree robbery.  The particular facts and circumstances of this case "would lead a reasonable person to 'believe a crime [was] about to be consummated absent an intervening force'—and thus that 'the attempt [was] underway'" when the police interceded.  (*Decker*, *supra*, 41 Cal.4th at p. 9.)

In a related argument, defendant says "it is unknown whether the intended victims were even home," and alleges "their presence was a condition precedent to an attempted robbery that otherwise would have been a mere burglary."  He cites no authority for this proposition and fails to affirmatively demonstrate error.  It is settled that "the commission of an attempt does not require proof of any particular element of the completed crime," and "a person may be convicted of an attempt to commit a crime he never could have completed under the circumstances."  (*People v. Chandler* (2014) 60 Cal.4th 508, 517.)

## II.    Criminal Street Gang Conspiracy (§ 182.5)

Defendant was found guilty under sections 182 and 182.5 for conspiring to commit a home invasion robbery.  He disputes his conviction on count 20, which alleged a violation of the latter statute.  Although presented as an insufficient evidence claim, the determinative issue is one of statutory interpretation.  A secondary challenge is made on the basis of instructional error.  The standard of review is de novo.  (*John v. Superior Court* (2016) 63 Cal.4th 91, 95; *People v. Cole* (2004) 33 Cal.4th 1158, 1208.)

### A.    Applicable Law

Section 182 proscribes the "traditional" form of criminal conspiracy.  (*People v. Johnson* (2013) 57 Cal.4th 250, 257, 261-262.)  The offense is defined as an agreement between two or more people to commit any crime, "together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance thereof."  (*People v. Swain* (1996) 12 Cal.4th 593, 600, quoting §§ 182, subd. (a)(1), 184.)  In this context, an overt act is """"an outward act done in pursuance of the

13.

crime and in manifestation of an intent or design, looking toward the accomplishment of the crime.”’”  (*Johnson*, at p. 259, quoting *People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8.)

A traditional conspiracy does not require completion of the crime the conspirators have agreed to commit.  (*People v. Swain*, *supra*, 12 Cal.4th at p. 559.)  “Once one of the conspirators has performed an overt act in furtherance of the agreement, ‘the association becomes an active force, it is the agreement, not the overt act, which is punishable. Hence the overt act need not amount to a criminal attempt and it need not be criminal in itself.’  [Citations].”  (*People v. Johnson*, *supra*, 57 Cal.4th at p. 259.)

Section 182.5 was enacted by voter initiative (Proposition 21) in the year 2000 and “created a new form of conspiracy that is distinct from the traditional understanding of the crime ….”  (*People v. Johnson*, *supra*, 57 Cal.4th at p. 261.)  The statute provides:

> “Notwithstanding subdivisions (a) or (b) of Section 182, any person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182.”  (§ 182.5.)

The California Supreme Court has identified five differences between the two types of criminal conspiracies.  First, whereas a traditional conspiracy “encompasses a stand-alone agreement by former strangers to commit a single crime,” a conviction under section 182.5 requires proof the defendant is “an active gang participant with knowledge of other members’ pattern of criminal gang activity.”  (*People v. Johnson*, *supra*, 57 Cal.4th at pp. 261–262.)  Second, a section 182.5 conspiracy “relates only to the commission of a felony.”  (*Johnson*, at p. 262.)  In contrast, section 182, subdivision (a)(1), refers to “any crime” and thus applies to conspiracies to commit misdemeanors. (*Johnson*, at p. 262.)

14.

"Third, traditional conspiracy requires both the specific intent to agree, and specific intent to commit a target crime. [Citation.] A [section] 182.5 conspiracy does not require any prior agreement among the conspirators to promote, further, or assist in the commission of a particular target crime. Even without a prior agreement, an active and knowing gang participant who acts with the required intent to promote, further, or assist in the commission of a felony by other gang members can violate section 182.5. That act of assistance or promotion replaces the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 262.)

"Fourth, traditional conspiracy liability attaches once an overt act is committed. A [section] 182.5 conspiracy requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 262.)

"Fifth, section 182.5 brings within its ambit not only a gang member who promotes, furthers, or assists in the commission of a felony. It also embraces an active and knowing participant who merely *benefits* from the crime's commission, even if he or she did not promote, further, or assist in the commission of that particular substantive offense. This constitutes a substantial expansion of a traditional conspiracy application. The 'one who benefits' provision recognizes that gang activities both individually and collectively endanger the public and contribute to the perpetuation of the gang members' continued association for criminal purposes. Due to the organized nature of gangs, active gang participants may benefit from crimes committed by other gang members. When such benefits are proven along with the other elements of the statute, section 182.5 permits those benefitting gang participants to be convicted of conspiracy to commit the specific offense from which they benefitted."[2] (*Johnson*, *supra*, 57 Cal.4th at p. 262.)

---

[2]The *Johnson* opinion does not address the seeming discrepancy between the third and fifth precepts. It is said the "act of assistance or promotion replaces the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy" (*People v. Johnson*, *supra*, 57 Cal.4th at p. 262), yet liability may be imposed upon an "active and knowing [gang] participant who merely *benefits* from the crime's commission, even if he or she did not promote, further, or assist in the commission of that particular substantive offense." (*Ibid*.) However, one who "merely *benefits* from the crime's commission" cannot be found guilty unless "such benefits are proven along with the other elements of the statute." (*Ibid.*) It is unclear to us how a defendant who merely benefits from a crime committed by his or her fellow gang members can be prosecuted under section 182.5 if the defendant did not also promote, further, or assist in the

### B. Sufficiency of the Evidence

The verdict form for count 20 indicates defendant was convicted of "criminal street gang conspiracy, to wit: robbery-in concert, in violation of … sections 182.5, 212.5, and 213." (Full capitalization omitted.) Defendant's argument for reversal is based on the following statements in *Johnson*: "[T]raditional conspiracy liability attaches once an overt act is committed. A [section] 182.5 conspiracy requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 262.) Since neither he nor his fellow gang members committed an actual robbery, defendant claims the evidence is insufficient to support the conviction.

The People agree with defendant but also contend "the conviction may be modified to criminal street gang conspiracy to commit attempted home invasion robbery to conform the verdict to the facts as found by the jury." Defendant makes a qualified concession, stating "the possibility of reducing the gang conspiracy offense to the lesser included offense of gang conspiracy to commit attempted home invasion robbery would arise" if this court finds sufficient evidence to support the count 163 verdict of attempted first degree robbery, which we have done. However, defendant maintains the "gang conspiracy" conviction must still be reversed because of instructional error (see further discussion, *post*).

Under sections 1181 and 1260, "an appellate court that finds that insufficient evidence supports the conviction for a greater offense may, in lieu of granting a new trial, modify the judgment of conviction to reflect a conviction for a lesser included offense." (*People v. Navarro* (2007) 40 Cal.4th 668, 671.) Attempted robbery is a lesser included offense of robbery. (*People v. Crary* (1968) 265 Cal.App.2d 534, 540; see *People v. Webster* (1991) 54 Cal.3d 411, 443 ["The jury received instructions correctly defining

---

commission of the required felony. Since defendant assisted in felonious conduct, we need not reach this issue.

16.

robbery *and* the lesser included offenses of attempted robbery"].) In a traditional conspiracy case, the defendant may be convicted of conspiring to commit a lesser crime included in the alleged target offense. (See *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1706 ["the trial court has a sua sponte obligation to instruct on lesser included target offenses if there is evidence from which the jury could find a conspiracy to commit a lesser offense"].) Despite these principles, the modification issue is not as straightforward as it might appear.

On the one hand, *Johnson* instructs that section 182.5 "requires the actual commission of felonious criminal conduct as *either* an attempt *or* a completed crime." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 263, italics added.) On the other hand, *Johnson* seems to accept as true the conclusion of *People v. Iniguez* (2002) 96 Cal.App.4th 75, which holds that conspiracy to commit an attempt crime "is a conclusive legal falsehood" and "nonexistent offense" because the underlying agreement would contemplate nothing more than "an ineffectual act." (*Id.* at p. 79.) Moreover, "[n]o one can simultaneously intend to do and not do the same act." (*Ibid*.)

In *Johnson*, the California Supreme Court restated the holding of *People v. Iniguez* as follows: "[U]nder a traditional conspiracy approach, one cannot conspire to *try* to commit a crime. An agreement to commit a crime is required, even if nothing more than an overt act is ultimately done." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 264.) Does the high court's reference to the "traditional conspiracy approach" indicate a different rule applies to section 182.5? The parties believe it does. Courts have long understood the essence of a conspiracy to be the unlawful agreement (e.g., *People v. Marsh* (1962) 58 Cal.2d 732, 743), but, as the People point out, *Johnson* holds no such agreement is required to satisfy the elements of section 182.5. The "act of assistance or promotion replaces the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy." (*Johnson*, at p. 262.) The People thus submit "it is possible to be guilty of a criminal street gang conspiracy to commit an attempted offense."

17.

Based on *Johnson* and principles of stare decisis, we accept the parties' position. Section 182.5 requires proof of actual felonious conduct, and the evidence is insufficient to establish commission of the alleged offense (first degree robbery) by defendant or his fellow gang members. However, there is substantial evidence of defendant's commission of attempted first degree robbery, and such evidence satisfies the requirement of willful promotion, furtherance, and/or assistance in the commission of a felony. Defendant does not dispute the sufficiency of the evidence as to the remaining elements of the crime, and we perceive no error in that regard. Therefore, notwithstanding defendant's claim of instructional error, count 20 may be modified to reflect a section 182.5 conviction predicated upon the felonious conduct of attempted first degree robbery.

## C.      Instructional Error

Defendant alleges reversible error based on the use of conflicting instructions to explain the gang conspiracy charge. The assertion of error is valid, but prejudice is lacking.

There is no pattern instruction for the offense described in section 182.5. However, the elements of a so-called gang conspiracy are nearly identical to those of active participation in a criminal street gang. A side-by-side comparison of sections 182.5 and 186.22, subdivision (a) reveals the only material distinction to be the words "or benefits from" in section 182.5.

Section 186.22, subdivision (a) provides:

> "*Any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang,* shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." (Italics added.)

Section 182.5 provides:

18.

"Notwithstanding subdivisions (a) or (b) of Section 182, *any person who actively participates in any criminal street gang*, as defined in subdivision (f) of Section 186.22, *with knowledge that its members engage in or have engaged in a pattern of criminal gang activity*, as defined in subdivision (e) of Section 186.22, *and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang* is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182." (Italics added.)

The jury was instructed on the elements of section 182.5 with an adapted version of CALCRIM No. 1400, which is "the standard jury instruction for the crime of active participation in a criminal street gang." (*People v. Lamas* (2007) 42 Cal.4th 516, 525, fn. 7.) The written version was labeled "Criminal Street Gangs Instructions" and had a subheading: "1400. Active Participation in Criminal Street Gang (Pen. Code, §§ 186.22(a) 182.5)" (Boldface omitted; some capitalization omitted.) The first sentence of the instruction said: "The defendant is charged in Count 20 with participating in a criminal street gang in violation of … section 182.5."

The CALCRIM No. 1400 instruction recited the elements of section 186.22, subdivision (a) and defined the terms "criminal street gang," "pattern of criminal gang activity,"[3] and "felonious criminal conduct." The element of "active participation" was correctly described as requiring proof of "involvement with a criminal street gang in a way that is more than passive or in name only." (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 [active participation means "participation that is more than nominal or passive"].) The instruction further explained how willful assistance, furtherance, or promotion of felonious conduct can be accomplished by "directly and actively committing a felony offense" or "aiding and abetting a felony offense." (See *id*. at pp. 1135–1136; *People v. Ngoun* (2001) 88 Cal.App.4th 432, 435–437.)

---

[3]As explained in *People v. Zermeno* (1999) 21 Cal.4th 927, "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.'" (*Id*. at p. 930.) The list of qualifying offenses is found in section 186.22, subdivision (e)(1)–(33).

Certain definitions were tailored to the People's theory of the case, so the phrase "pattern of criminal gang activity" was defined as the "commission of, attempted commission of, conspiracy to commit, solicitation to commit, conviction of, or having a juvenile petition sustained for the commission of: [¶] … any combination or two or more of the following crimes, or two or more occurrences of one or more of the following crimes: Assault, Conspiracy to Commit Assault, Murder, Attempted Murder, Robbery, or Conspiracy to Commit Robbery." The references to assault and murder accounted for certain predicate offenses evidence introduced during trial. The People also relied on the charged offenses and the convictions of gang members who had already pleaded out of the case. (See *People v. Tran* (2011) 51 Cal.4th 1040, 1046 ["a predicate offense may be established by evidence of the charged offense"].)

The element of "felonious criminal conduct" was defined as "committing or attempting to commit any of the following crimes: Conspiracy to Commit a crime, to wit: Robbery - In Concert and Attempted Robbery - In Concert, Assault, Conspiracy to Commit Assault, Murder, Attempted Murder, Robbery, or Prohibited Possession of a Firearm." The People concede this part of the instruction was "problematic" because the assault and murder crimes, as well as the target offense of robbery, were factually irrelevant.

Defendant's claim is based on a separate instruction adapted from CALCRIM No. 415 to explain traditional conspiracy principles. The jury was mistakenly told the instruction applied to counts 19, 20, and 162. In fact, it only applied to counts 19 and 162 (conspiracy in violation of § 182). Defendant argues the jury may have relied on the traditional conspiracy instruction to reach its verdict on count 20, which would mean it failed to consider the elements of active participation and knowledge of a pattern of criminal gang activity.

When a jury is misinstructed on the elements of a charge, reversal is required unless the error was harmless beyond a reasonable doubt. (*People v. Wilkins* (2013) 56

20.

Cal.4th 333, 348.) "An instruction on an invalid theory may be found harmless when 'other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary' under a legally valid theory." (*In re Martinez* (2017) 3 Cal.5th 1216, 1226.) Even in cases where the instructions omit an essential element, the error may be deemed harmless if the evidence is "overwhelming and uncontroverted" "'such that the jury verdict would have been the same absent the error.'" (*People v. Merritt* (2017) 2 Cal.5th 819, 832, quoting *Neder v. United States* (1999) 527 U.S. 1, 17.)

Our analysis begins with defendant's assumption the CALCRIM No. 1400 instruction was overlooked or disregarded. Jurors are presumed to follow the instructions they are given (*People v. Holt* (1997) 15 Cal.4th 619, 662), and this jury was told to "[p]ay careful attention to all of the[] instructions and consider them together." The jury was further advised that some instructions might not apply depending on its factual determinations, but there were no factual issues resolvable in such a way as to make CALCRIM No. 1400 inapplicable. Moreover, a separate instruction on the gang enhancement allegations (§ 186.22, subd. (b)) required the jury to cross-reference CALCRIM No. 1400 in order to determine the existence of a "criminal street gang" and the required "pattern of criminal gang activity." The enhancements applied to all remaining counts, including the charge of attempted first degree robbery, and each allegation was found to be true.

Given the jury's verdict on count 163 and the related gang enhancement finding, defendant was necessarily found to have willfully promoted, furthered, and/or assisted in the commission of attempted first degree robbery pursuant to a gang motive and/or in association with gang members. (See § 186.22, subd. (b)(1).) Since the felonious conduct required by section 182.5 was conclusively established, the error in failing to instruct on potential liability for merely benefitting from such conduct was clearly harmless. The references to other crimes such as assault and murder were harmless for the same reason.

21.

We also consider the arguments of counsel in assessing the potential impact of the instructions. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) Although the instruction on traditional conspiracy liability erroneously referenced count 20, the People's closing argument correctly explained the elements of section 182.5. The prosecutor said, "[F]or criminal street gang conspiracy, you have to be actively participating in the gang. … Here did we see that with [defendant]? We did. He was actively involved in what was going on. He was in the car going to do it." The prosecutor also highlighted the knowledge requirement: "[W]hat you need is any person who actively participates with knowledge as [*sic*] members engage in or have engaged in the pattern of criminal gang activity. This case satisfies that. They're plotting and planning these robberies. They're all gang members. They're all active participants. I think it's pretty much satisfied."

Lastly, we look to the uncontroverted evidence of defendant's active participation and knowledge of a pattern of criminal gang activity by Norteños. Active participation can be proven by evidence of gang tattoos, self-admission of gang membership, contacts with a criminal street gang and/or its members, gang-related contacts with police, and being in the company of a known gang member while committing a charged offense. (See *People v. Castenada* (2000) 23 Cal.4th 743, 752–753; *People v. Williams* (2009) 170 Cal.App.4th 587, 626; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1511.) Knowledge of gang members engaging in a pattern of criminal gang activity is generally inferable from the same evidence showing a defendant's active participation in the gang. (*People v. Carr* (2010) 190 Cal.App.4th 475, 489.)

The People's gang expert opined defendant was an active Norteño based on his gang tattoos and involvement in the current case. The tattoos included Norteño imagery (the "huelga bird") on his neck and shoulder, the letters ESVR on his stomach (purportedly connoting the East Side Varrio Reedley subset) and the words "puro Norte," meaning pure North, on his neck. The People's evidence conclusively proved two of defendant's accomplices, Sergio Heredia and Juan Hinojosa, were convicted of gang-

related conspiracy to commit robbery charges based on their respective roles in this case. Both men had been inside the Nissan Altima with defendant immediately prior to his arrest, and Hinojosa was proven to be a Norteño gang member (Heredia's membership was implied but not directly addressed in the trial testimony). Defense counsel avoided mentioning the gang evidence against his client but referred to the accomplices as "gangsters" during closing argument.

In light of the uncontroverted gang evidence and the jury's verdicts on other counts, a different result on count 20 is inconceivable. Defendant's commission of attempted robbery satisfied the "felonious criminal conduct" element of section 182.5 and was also a qualifying offense for purposes of the "pattern of criminal gang activity" (§ 186.22, subd. (e)(2)). Defendant acted in concert with other gang members who were convicted of qualifying offenses based on the same incident, which plainly demonstrated his active gang participation and knowledge of a pattern of criminal gang activity. It is evident, beyond a reasonable doubt, the verdict was not attributable to the instructional error. The judgment will be modified to reflect a violation of section 182.5 based on the act of attempted first degree robbery, and defendant shall be resentenced accordingly.

## III.    Duplicative Convictions

Counts 19 and 162 alleged conspiracy to commit home invasion robbery, i.e., traditional conspiracy liability under section 182, subdivision (a)(1). At trial, the People argued the agreement to commit robbery at two locations constituted two separate conspiracies. Defendant maintains the evidence showed only one conspiracy to commit two robberies. The Attorney General concedes this issue, and we accept the concession as appropriate. (See *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669 ["it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies"]; *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557 ["'One agreement gives rise to only a single offense, despite any multiplicity

of objects'"].)  Therefore, count 162 will be reversed for insufficient evidence.  The corresponding sentence is ordered vacated and the charge shall be dismissed.

## IV.    Sentencing

Defendant was sentenced to 35 years to life in prison for the count 19 conviction of (traditional) conspiracy to commit home invasion robbery.  The sentence was imposed pursuant to section 186.22, subdivision (b)(4)(B), under which the punishment for a gang-related home invasion robbery is 15 years to life, and section 182, subdivision (a), under which conspiracy to commit a felony is "punishable in the same manner and to the same extent as is provided for the punishment of that felony."  The base term was doubled because of a prior strike and increased by five years because of a prior serious felony conviction.

A consecutive 19-year prison sentence was imposed for count 163 (attempted home invasion robbery), which represented one-half of the upper term of nine years (§§ 213, subd. (a)(1)(A), 664, subd. (a)) doubled for the prior strike and increased by a five-year gang enhancement (§ 186.22, subd. (b)(1)(B)) and the five-year prior serious felony conviction enhancement (§ 667, subd. (a)).  Punishment on all other counts was either stayed or ordered to be served concurrently.  The two prior prison term enhancements (former § 667.5, subd. (b)) were ordered stayed pursuant to section 654.

### A.    Count 19

As discussed, home invasion robbery ordinarily carries a maximum punishment of nine years in prison.  (§ 213, subd. (a)(1)(A).)  If the offense is found to be gang related for purposes of section 186.22, the punishment is life in prison with a minimum parole ineligibility period of 15 years.  (§ 186.22, subd. (b)(4)(B).)  "Section 186.22, subdivision (b)(4)(B) is not an enhancement, but rather an 'alternate penalty provision,' meaning it sets forth an alternate penalty for the underlying offense if the jury finds the conditions

24.

specified in the provision have been satisfied." (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1011, fn. 8.)

Section 182 requires a convicted conspirator to be punished "'in the same manner and to the same extent as is provided for the punishment of' the underlying target offense." (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1119.) Defendant argues this sentencing mandate does not apply to a conspiracy among gang members to commit home invasion robbery. The issue presented requires statutory interpretation.

"By voting for Proposition 21 (Gang Violence and Juvenile Crime Prevention Act of 1998, eff. Mar. 8, 2000), the electorate created six new life-term gang-related felony offenses." (*People v. Florez* (2005) 132 Cal.App.4th 314, 319.) Four of those offenses are listed in section 186.22, subdivision (b)(4)(B). If committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," the alternate penalty applies to home invasion robbery, carjacking, a felony violation of section 246 (shooting at an occupied dwelling, building, or vehicle), and violations of section 12022.55 (discharging a firearm from a vehicle under specified circumstances). (§ 186.22, subd. (b)(4)(B).)

"'It is a general rule of statutory construction that the courts will interpret a measure adopted by vote of the people in such manner as to give effect to the intent of the voters adopting it. [Citation.] It must be held that the voters judged of the amendment they were adopting by the meaning apparent on its face according to the general use of the words employed.'" (*Kaiser v. Hopkins* (1936) 6 Cal.2d 537, 538.) Basically, courts are bound by a statute's plain meaning. "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters)." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735; see *People v. Birkett*

(1999) 21 Cal.4th 226, 231 [the plain meaning rule applies to unambiguous statutory language unless it would lead to absurd results].)

Defendant states his position thusly: "On its face, the plain language of section 186.22, subdivisions [(b)(4)] [and] (b)(4)(B), indicates these subdivisions only apply to the completed forms of the enumerated offenses simply because it does not list conspiracies." Anticipating we might view the statutory language as ambiguous, defendant's briefing contains several pages of argument on the topic of voter intent. We agree the statutory language is unambiguous. However, under the rationale of *People v. Athar* (2005) 36 Cal.4th 396, we presume any intent to exclude conspiracy liability from the purview of section 186.22, subdivision (b)(4)(B) would be expressly stated therein, which it is not. (See *Athar*, at p. 401.)

In *Athar*, the appellant was convicted of conspiring to commit money laundering under circumstances that would have triggered the enhancement provisions of section 186.10, subdivision (c) had the conspiracy reached fruition. (*People v. Athar*, *supra*, 36 Cal.4th at pp. 398–399.) "The Court of Appeal majority upheld [the] conspiracy conviction and application of the money laundering enhancement based on the fact that conspirators under section 182, subdivision (a), must be punished 'in the same manner and to the same extent' as those convicted of the 'target felony,' i.e., money laundering." (*Id.* at pp. 400–401.) The appellate court "observed that '[h]ad the Legislature intended to apply the money laundering enhancements to only those persons convicted of the substantive offense of money laundering, it would have so provided in subdivision (c) of section 186.10.' Therefore, … because the Legislature did not exclude conspiracy actions from the enhancement provisions, the enhancement … was mandatory." (*Id.* at p. 401.) This reasoning was endorsed by a four-justice majority of the California Supreme Court, which concluded sentencing under the conspiracy statute "is not limited to the base term of [the target] offense." (*Id.* at p. 406.)

The majority opinion in *Athar* distinguishes *People v. Hernandez* (2003) 30 Cal.4th 835 (*Hernandez*), where the issue was whether the death penalty or life without parole (LWOP) could be imposed for conspiracy to commit murder under special circumstances. (*People v. Athar*, *supra*, 36 Cal.4th at pp. 402–404.) Pursuant to section 182, the applicable punishment is "that prescribed for murder in the first degree." (*Id.*, subd. (a).) In the absence of special circumstances, first degree murder is punishable by a prison term of 25 years to life. (§§ 190, subd. (a), 190.2.) Based on a variety of factors, including grave concerns over the constitutionality of imposing capital punishment for crimes not resulting in death, *Hernandez* concluded the special circumstance provisions do not apply to conspiracy to commit murder. (*Hernandez*, *supra*, at pp. 864–870.) Here, as in *Athar*, the statute at issue "does not involve imposition of the death penalty without a murder, or any penalty that would raise serious constitutional concerns." (*Athar*, at p. 404.)

Defendant notes the money laundering statute can be violated by merely attempting to engage in the prohibited conduct (§ 186.10, subd. (a)), so the result in *Athar* did not create an alternative consequence for conspiring, as opposed to attempting, to engage in the proscribed behavior. The *Athar* majority made the same observation while distinguishing *Hernandez*. (*People v. Athar*, *supra*, 36 Cal.4th at p. 404.) However, a lack of disparity in the punishments for conspiracy and attempt is an uncommon scenario.

By legislative design, conspiracy to commit a crime is ordinarily punished twice as severely as an attempt to commit the same target offense. (See §§ 182, subd. (a), 664, subd. (a).) Harsher punishment for conspiracy is justified by "the likelihood that the criminal object successfully will be attained" and the danger of collateral consequences, namely, "'the commission of crimes unrelated to the original purpose for which the combination was formed.'" (*People v. Morante* (1999) 20 Cal.4th 403, 416, fn. 5, quoting *Callanan v. United States* (1961) 364 U.S. 587, 594.) "Collaboration in a

27.

criminal enterprise significantly magnifies the risks to society by increasing the amount of injury that may be inflicted." (*Morante*, at p. 416, fn. 5.)

The punishment for attempt is typically "one-half the term of imprisonment prescribed upon a conviction of the offense attempted," but not for attempted willful and premeditated murder. (§ 664, subd. (a).) In *Hernandez*, the high court examined the interplay between section 182 and the statutory scheme governing murder under special circumstances, the latter of which had been enacted at a time when attempted willful and premeditated murder was punishable by a determinate prison term ranging from five to nine years. (*Hernandez*, *supra*, 30 Cal.4th at pp. 867–868.) There was no reason to believe the electorate intended to establish the grossly disparate punishment of death or LWOP for any type of murder conspiracy. (*Ibid*.) An analogous dichotomy does not exist with regard to the punishment for attempted gang-related home invasion robbery and the penalty set forth in section 186.22, subdivision (b)(4)(B).

We conclude section 186.22, subdivision (b)(4)(B) merely states the punishment for a conviction of gang-related home invasion robbery. There are no further inferences to be drawn from its plain language. Likewise, "[t]he general plain meaning expressed in section 182, subdivision (a), that a conspirator will be punished in the same manner and to the same extent as one convicted of the underlying felony, does not require additional legislative clarity." (*People v. Athar*, *supra*, 36 Cal.4th at p. 405.)

The jury below returned a guilty verdict on the charge of conspiracy to commit home invasion robbery. It also found defendant committed the offense "for the benefit of, at the direction of, or in association with a criminal street gang [and] with the specific intent to promote, further, and assist in criminal conduct by gang members within the meaning of [sections] 186.22(b)(1) and 186.22(b)(4)." The penalty for the target offense is set forth in section 186.22, subdivision (b)(4)(B), and the trial court did not err by sentencing defendant "in the same manner and to the same extent as is provided for the punishment of that felony" (§ 182, subd. (a)).

28.

## B.       Senate Bill No. 1393

On September 30, 2018, the Governor approved Senate Bill No. 1393 (2017–2018 Reg. Sess.), which amended sections 667 and 1385.  The legislation went into effect on January 1, 2019.  (Stats. 2018, ch. 1013, §§ 1–2.)  As a result, trial courts now have discretion under section 1385 to strike or dismiss the five-year sentencing enhancement prescribed by section 667, subdivision (a) for prior serious felony convictions.

The parties agree Senate Bill No. 1393 applies retroactively to nonfinal judgments. Absent evidence to the contrary, it is presumed the Legislature intended statutory amendments reducing the punishment for a crime to apply retroactively to defendants whose judgments are not yet final on the statute's operative date.  (*People v. Brown* (2012) 54 Cal.4th 314, 323; *In re Estrada* (1965) 63 Cal.2d 740, 745.)  Consistent with the case law on this issue, we accept the parties' position.  (E.g., *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1173; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.) Therefore, at the time of resentencing in light of the reversal of count 162 and modification of count 20, the trial court shall consider whether to exercise its discretion to strike any of the prior serious felony conviction enhancements.

## C.       Miscellaneous Issues

The parties identify an error in the abstract of judgment regarding the number of prior serious felony conviction enhancements imposed at sentencing.  Since resentencing will occur on remand, a new abstract of judgment will be prepared.  Therefore, the issue is moot.

The parties raise no issues with regard to the prior prison term enhancements, but we note the trial court erred by staying the punishment for those enhancements.  When an allegation based on section 667.5, subdivision (b) is found to be true, the trial court must either impose the additional prison term or strike the enhancement.  (*People v. Langston* (2004) 33 Cal.4th 1237, 1241.)  Furthermore, effective January 1, 2020, the one-year enhancement provided for in section 667.5, subdivision (b) is inapplicable to all prior

29.

prison terms except those served for a sexually violent offense within the meaning of Welfare and Institutions Code section 6600, subdivision (b).  (Stats. 2019, ch. 590, § 1 [Sen. Bill No. 136 (2019–2020 Reg. Sess.)].)  We leave it to the parties to address these issues on remand.

## DISPOSITION

As to count 162 only, the judgment is reversed for insufficient evidence.  As to count 20, the judgment is ordered modified to reflect a conviction of violating section 182.5 based on the felonious conduct of attempted first degree robbery within the meaning of sections 211, 212.5, subdivision (a), and 213, subdivision (a)(1)(A).  The matter is remanded for resentencing, at which time the trial court shall determine whether to exercise its discretion to strike or dismiss one or more prior serious felony conviction enhancements as authorized by section 1385.  Upon conclusion of the further proceedings, the trial court shall prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
FRANSON, Acting P.J.


_____
SMITH, J.

30.